# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ROBERTA A. PALACIOS**
       **Plaintiff,**

   v.                                       **Case No. 20-C-384**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
       **Defendant.**

## DECISION AND ORDER

Plaintiff Roberta Palacios seeks judicial review of the denial of her application for social security disability benefits, arguing that the Administrative Law Judge ("ALJ") assigned to the case impermissibly "played doctor" in evaluating an MRI report, erred in considering her statements regarding her symptoms and limitations, and failed to provide good reasons for discounting an opinion from one of her treating physicians. For the reasons that follow, I reverse the ALJ's decision and remand for further proceedings.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Impairments

Plaintiff applied for benefits in December 2015, alleging a disability onset date of August 26, 2014 (Tr. at 16, 176), due primarily to cervical and lumbar spinal impairments (Tr. at 206).[1] Plaintiff underwent cervical fusion surgery in 2003, with a revision surgery in August 2014, and lumbar fusion surgery in August 2015. She attempted to return to work as a nurse following

---

[1] The agency also evaluated plaintiff's alleged mental impairments, but plaintiff does not in this action contest the ALJ's consideration of those conditions, so I do not discuss them further.

the 2014 and 2015 procedures, but ultimately found even part-time hours too much. She reported that the surgeries did not fully resolve her symptoms, and that she continued to experience pain, numbness, and weakness in her upper and lower extremities. (Tr. at 266-74, 327-29, 345, 430.)

The record contains numerous post-surgical diagnostic scans, including as is pertinent to this appeal October 2015 and August 2016 cervical and lumbar MRIs. (Tr. at 385-88, 637-39.) The October 2015 cervical MRI revealed degenerative changes, most severe at C6/C7, with mild to moderate spinal canal stenosis, mild to moderate right-sided foraminal stenosis, and some severe left-sided foraminal stenosis. (Tr. at 388.) On November 7, 2015, after reviewing the scans, plaintiff's surgeon, Jeffrey Jacoby, M.D., stated:[2]

> Unfortunately she has multiple complaints and may not significantly improve with all of the interventions outlined. It's possible she may be a candidate for disability.
>
> For now I was able to reassure [plaintiff] that it doesn't appear that anything dangerous is going on in her neck or back and that we can likely treat both problems very conservatively and expected [sic] good outcome.

(Tr. at 447.)

The August 2016 cervical MRI revealed "underlying spinal stenosis with possible associated cord edema or myelomalacia at C3-C4 and possibly C4-C5." (Tr. at 638, 668.) On

---

[2]During a previous visit on January 14, 2015, plaintiff reported continued numbness in her left arm and some pain, but it had improved since the August 2014 surgery. Dr. Jacoby "explained that myelopathy and radiculopathy are different and in myelopathy cases like hers, we are just trying to ensure that the disorder does not worsen and when it does improve, that is a blessing." (Tr. at 465.) Dr. Jacoby returned her to full duty at that time but scheduled a follow up in two months. (Tr. at 465.) On April 10, 2015, plaintiff continued to complain of pain radiating down her left arm, and Dr. Jacoby referred her for an upper extremity EMG nerve study (Tr. at 460), which revealed evidence for a right C6 and C8 chronic radiculopathy (Tr. at 420). The record also contains a December 2016 EMG study of the lower extremities, which showed no evidence of radiculopathy. (Tr. at 703-12.)

2

October 15, 2016, Dr. Jacoby indicated:

> [Plaintiff] is an unfortunate 45-year-old female who underwent revision cervical spine surgery with myself as well as a lumbar spine surgery and despite apparent successful surgery, the patient has continued to struggle significantly with symptoms. She notes that she has increase in neck pain as well as worsening arm and hand numbness, which seems intermittent. She also notes leg pain in her left leg that goes to the plantar aspect of her left foot.

(Tr. at 608-09.) Dr. Jacoby reviewed the August 2016 MRIs, stating that "the neck MRI is difficult to read as it has a great deal of artifact; however, there appears to be no signs of central canal stenosis. The MRI of the lumbar spine shows some left-sided L5-S1, rather in her case L6-S1 facet arthropathy with some narrowing of the foramen." (Tr. at 611.) His impression was: "Chronic neck, back, arm and leg pain, which will likely not respond to surgical intervention." (Tr. at 611.) He explained:

> that likely her arm symptoms and maybe her gait imbalance is probably from perhaps chronic spinal cord impingement that was relieved at the time of her revision surgery, but it is unclear how long she lived with that and therefore that myelomalacia in her spinal cord is likely going to cause symptomatic problems and there does not appear to be any treatment for that.

(Tr. at 611.)

On June 20, 2017, Dr. Jacoby completed a medical source statement, listing a diagnosis of failed back syndrome with a poor prognosis, and symptoms of neck and arm pain/dysfunction and back and leg pain/dysfunction, with clinical findings of weakness and diminished range of motion. He indicated that plaintiff had been treated with cervical and lumbar surgeries, physical therapy, injections, and pain management. (Tr. at 678.) He opined that plaintiff could continuously sit for 15 minutes, stand for five to ten minutes, and walk 1/4 block; in a day, she could sit and stand/walk less than two hours. She required a job that allowed her to shift positions during the workday and needed to walk for five minutes every 20-

3

30 minutes. (Tr. at 679.) She also needed to take unscheduled breaks every two to three hours, lasting 10-15 minutes, due to muscle weakness and pain/numbness. She needed to use a cane while standing/walking due to imbalance, pain, and weakness. (Tr. at 680.) She could lift no more than 10 pounds, rarely engage in postural movements, and use her bilateral upper extremities for handling and reaching just 25% of the day. Finally, he opined that her symptoms would be severe enough to interfere with attention and concentration 25% or more of the workday. (Tr. at 681.)

In a December 4, 2017, treatment note, plaintiff's pain management provider, Brett Malo, M.D., stated:

> [Plaintiff's] neck pain and radicular symptoms are likely related to the significant left sided foraminal stenosis at C5/C6 secondary to an osteophyte and complicated by an upper cross syndrome leading to a left sided neurogenic thoracic outlet syndrome. As for her low back pain and radicular symptoms in the left foot, this is likely secondary to the abundant granulation tissue around the thecal sac and L6 nerve roots and complicated by a seroma leading to mild to moderate central canal stenosis at the L6 level and also complicated by left sided SI joint dysfunction. With her symptoms and medication usage pretty stable, we will continue with Norco[.] I do agree that [plaintiff] does have a disability due to her multiple cervical fusions and her low back pain secondary to granulation tissue surrounding the left L6 nerve.

(Tr. at 773.)

**B.    Procedural History**

The agency denied plaintiff's application initially on February 10, 2016 (Tr. at 105), based on the review of Syd Foster, D.O., who concluded that plaintiff could still perform a range of light work (Tr. at 79-89). Plaintiff requested reconsideration (Tr. at 109), but on November 29, 2016 (Tr. at 110), the agency maintained the denial based on the review of Abraham Colb, M.D., who opined that plaintiff could perform a reduced range of light work (Tr. at 90-100). As part of the reconsideration analysis, the agency noted the results of Dr. Jacoby's October 2016

4

exam, including his discussion of the August 2016 lumbar MRI, but it appears that the agency reviewers did not at that time have the August 2016 cervical MRI. (Tr. at 94.)

In January 2017, plaintiff requested a hearing (Tr. at 117), and on July 10, 2018, she appeared with counsel before the ALJ. The ALJ also summoned a vocational expert ("VE") to provide testimony on jobs plaintiff might be able to do. (Tr. at 40-42.)

Plaintiff testified that she lived with her husband and two children, ages eight and five. (Tr. at 46.) She had a bachelor's degree and employment history as a nurse. She attempted to return to work after her surgeries but found even part-time hours too much and stopped working entirely in January 2016. (Tr. at 48-52.)

Plaintiff testified that she could no longer work due to weakness in her hands, which caused her to drop things, and in her left leg, which caused falls once or twice per month; pain in her low back, aggravated by sitting and standing, and in her neck, radiating into her arms; and bowel and bladder symptoms. (Tr. at 55, 59-60.) She took a number of medications for muscle spasms, depression, and hypothyroidism. (Tr. at 58-59.) She had also tried a variety of different pain medications with Dr. Malo, some of which caused side effects including depression and lethargy. (Tr. at 62.) She participated in physical therapy after her surgeries, but it did not help much because her range of motion was very limited, especially in her neck. She also had injections, but they did not help at all. (Tr. at 67.)

Plaintiff testified that she took rests during the day, sitting in a recliner with her legs up, as well as naps. Her mother helped with household chores such as cleaning. (Tr. at 63.) Her children were at that point pretty much self-sufficient (Tr. at 64); when they were younger, plaintiff's adult daughter helped (Tr. at 69). Plaintiff indicated that she could stand for about five minutes, sit for five to ten minutes, and lift no more than a gallon of milk. (Tr. at 68.) She

5

reported that since her last surgery in August 2015 she used a cane to walk longer distances. (Tr. at 47.)

The VE classified plaintiff's past work as an LPN as medium generally, heavy as performed. (Tr. at 71-72.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, limited to sedentary work, with occasional postural movements and overhead reaching, and frequent handling and fingering. (Tr. at 72.) The VE testified that such a person could not perform plaintiff's past work but could do other jobs including laminator, circuit board screener, and semi-conductor bonder. (Tr. at 72-73.) If the person had to alternate positions between sitting and standing every 15 minutes she could not work at the sedentary level. (Tr. at 73.) Similarly, with a limitation to occasional handling and fingering, there would be no jobs. (Tr. at 73.) Employers would, the VE said, tolerate no more than one absence per month and no more than 10% time off task. (Tr. at 74.)

On October 31, 2018, the ALJ issued an unfavorable decision. (Tr. at 13.) Following the familiar five-step evaluation process, see 20 C.F.R. § 404.1520(a)(4), the ALJ determined (1) that plaintiff had not worked at the level of substantial gainful activity after the alleged onset date (Tr. at 18);[3] (2) that she suffered from a number of severe impairments, including degenerative disc disease of the cervical and lumbar spine (Tr. at 19); (3) that none of her impairments qualified as conclusively disabling under agency Listings (Tr. at 21); (4) that she had the residual functional capacity ("RFC") for a reduced range of sedentary work (Tr. at 24-25), precluding performance of her past work as a nurse (Tr. at 32-33); but (5) that she could

---

[3]The ALJ determined that plaintiff last met the insured status requirements on December 31, 2017. (Tr. at 18.) As discussed below, the Appeals Council found that was error, as plaintiff met the requirements through December 31, 2020. (Tr. at 4.)

6

perform other jobs, as identified by the VE, including laminator, circuit board screener, and semiconductor bonder (Tr. at 33-34).

In determining plaintiff's RFC, the ALJ considered plaintiff's statements regarding her symptoms and limitations, noting that plaintiff premised her claim primarily on cervical and lumbar spinal disease, reporting pain, weakness, and numbness, which interfered with self-care and other daily activities. (Tr. at 25.) Following the two-step test for symptom evaluation, the ALJ found that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence of record. (Tr. at 25-26.) The ALJ first noted that plaintiff's statements about her symptoms and limitations were inconsistent with the objective medical evidence, with her providers often noting relatively mild physical findings during examinations, including generally intact muscle power, normal gait, and full range of motion. (Tr. at 26-27.)

Second, the ALJ found plaintiff's statements inconsistent with her treatment history. (Tr. at 27.) While plaintiff underwent cervical surgery in August 2014 and lumbar surgery in August 2015, her providers noted the surgeries were by their standards successful despite her reports of enduring pain. (Tr. at 27-28.) Dr. Jacoby noted in 2015 that imaging did not show "anything dangerous going on" and in October 2016 that her chronic spinal cord impingement was relieved at the time of her revision surgery and that treatment for remaining symptoms was with conservative methods at that time. The ALJ noted that plaintiff's other treatment included physical therapy, medication, and injections, with some reported improvement. (Tr. at 28.)

Third, the ALJ concluded that the diagnostic evidence failed to demonstrate abnormalities consistent with plaintiff's allegations of debilitating pain, listing the findings from

7

the various scans. (Tr. at 28-29.) For instance, the ALJ stated than an "MRI of her cervical spine from August 2016 showed underlying spinal stenosis with possible associated cord edema or myleomalacia at C3-C4, and possible C4-C5, spinal canal narrowing from C4 through C6." (Tr. at 28.) The ALJ also discussed the EMGs in the record: a December 2016 EMG of the lower extremities, which showed no evidence of radiculopathy, and an April 2015 EMG of the bilateral upper extremities, which did show evidence for right C6 and C8 chronic radiculopathy. (Tr. at 29.) The ALJ acknowledged that while "the upper extremity EMG supports radiculopathy, the physical findings during her examinations do not support that her allegations of symptoms are as severe as she alleged." (Tr. at 29.)

The ALJ also considered the opinion evidence, giving little weight to the conclusions of the agency medical consultants, Drs. Foster and Colb, that plaintiff could perform light work, finding that later developed evidence and consideration of her subjective reports supported the greater limitation to sedentary work. (Tr. at 30.) The ALJ also gave little weight to Dr. Jacoby's June 2017 medical source statement:

> Acknowledging that Dr. Jacoby treated the claimant, his opinion is inconsistent with the record as a whole. As noted above, the claimant did display some loss of sensation, reduction in range of motion at times, with the most consistent being in her hips, but she also ambulated with a normal gait, could generally tandem and heel/toe walk, she could squat, she had full strength, her lower extremity EMG was normal and the imaging after her surgery that Dr. Jacoby described without "anything dangerous going on." Further, in January 2015, the claimant's treating provider, Dr. Jacoby noted in his treatment notes that he would return her to full duty. Dr. Jacoby's opinion is inconsistent with the record as a whole and the undersigned gives his opinion little weight.

(Tr. at 31-32.)

Finally, the ALJ gave little weight to Dr. Malo's December 2017 opinion that plaintiff had a disability due to multiple cervical fusions and her low back pain secondary to granulation

8

tissue surrounding the left L6 nerve:

> Dr. Malo's opinion is inconsistent with the evidence as a whole and infringes on a matter reserved for the Commissioner. As previously noted, the claimant did display some loss of sensation, reduction in range of motion at times, with the most consistent being in her hips, but she also ambulated with a normal gait, could generally tandem and heel/toe walk, she could squat, she had full strength, her lower extremity EMG was normal and the imaging after her surgery supported only conservative treatment. It also provides no function by function assessment of the claimant's ability to support his conclusion of disability.

(Tr. at 32.)

In sum, the ALJ concluded that plaintiff's "overall course of treatment, medications, objective medical findings, daily activities and the evidence as a whole supports the residual functional capacity and does not support allegations of disability." (Tr. at 32.) The ALJ accordingly denied the application. (Tr. at 34.)

The Appeals Council agreed to review the case, noting that the ALJ erred in determining plaintiff's date last insured. (Tr. at 4, 169-72.) However, the Council then adopted the ALJ's conclusions regarding whether plaintiff was disabled. (Tr. at 4.)

## II. DISCUSSION

### A. Standard of Review

Where, as here, the Appeals Council grants reviews but then adopts the ALJ's decision, the court reviews the decision of the ALJ as modified by the Appeals Council. Arbogast v. Bowen, 860 F.2d 1400, 1403 (7th Cir. 1988). As indicated above, aside from the date last insured, which is not an issue on this appeal, the Council agreed with the ALJ's conclusions in this case. In effect, then, my review will be of the ALJ's decision.

The court reviews an ALJ's decision to ensure that it uses the correct legal standards, is supported by substantial evidence, and contains an accurate and logical bridge from the

9

evidence to the conclusion. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020). Substantial evidence means such relevant evidence as a reasonable mind could accept as adequate to support a conclusion. Id. The court may not, under this deferential standard, re-weigh the evidence or substitute its judgment for that of the ALJ. L.D.R. v. Berryhill, 920 F.3d 1146, 1152 (7th Cir. 2019). But the "ALJ must evaluate the record fairly. Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003) (internal citations omitted); see also Yurt v. Colvin, 758 F.3d 850, 859 (7th Cir. 2014) (explaining that the Seventh Circuit has "repeatedly forbidden" ALJs from "cherry-picking" only the medical evidence that supports their conclusion); Moore v. Colvin, 743 F.3d 1118, 1124 (7th Cir. 2014) ("The ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record.").

**B.    Plaintiff's Arguments**

   **1.    August 2016 Cervical MRI**

Plaintiff first argues that the ALJ lacked the medical expertise to evaluate the August 2016 cervical MRI suggesting myelomalacia and ignored Dr. Jacoby's explanation that this untreatable condition was likely causing plaintiff's symptoms. (Pl.'s Br. at 11.) Plaintiff explains that in August 2014 Dr. Jacoby operated on her neck to address myelopathy (an injury to the spinal cord due to compression)[4] and radiculopathy (pinching of the nerve roots as they exit

---

[4] See Stedman's Medical Dictionary 1171 (27th ed. 2000).

10

the spinal cord, causing pain that radiates into the shoulder and/or arm, as well as muscle weakness and numbness).[5] (Tr. at 430.) In October 2016, Dr. Jacoby explained that while plaintiff's chronic spinal cord impingement was relieved by her August 2014 revision surgery, it was unclear how long she lived with that impingement and therefore the myelomalacia (softening of the spinal cord, which may be caused by myelopathy)[6] shown on the August 2016 MRI was likely going to cause symptoms, for which there did not appear to be any treatment. (Tr. at 611.) Plaintiff complains that the ALJ cherry-picked from this treatment note, citing it as evidence that the surgery was successful and further treatment could be conservative (Tr. at 28), while ignoring the impact of the "un-treatable" condition Dr. Jacoby referenced (Pl.'s Br. at 12).

Plaintiff further complains that the ALJ compounded the error by including the August 2016 MRI in the list of diagnostic evidence he found inconsistent with plaintiff's claims of debilitating pain. (Pl.'s Br. at 12-13.) She argues that the ALJ was not qualified to make that assessment; the agency medical consultants did not review the August 2016 cervical MRI, and the ALJ ignored Dr. Jacoby's discussion of it. (Pl.'s Br. at 13.)

The Seventh Circuit has cautioned that ALJs should not attempt to interpret raw medical data or tests without the benefit of expert medical opinion. See, e.g., McHenry v. Berryhill, 911 F.3d 866, 871 (7th Cir. 2018) ("We have said repeatedly that an ALJ may not 'play[] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny.") (quoting Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014)); Lambert v. Berryhill, 896 F.3d 768, 774 (7th

---

[5]https://orthoinfo.aaos.org/en/diseases--conditions/cervical-radiculopathy-pinched-nerve/ (last visited March 12, 2021).

[6]See Stedman's Medical Dictionary 1171 (27th ed. 2000).

11

Cir. 2018) ("ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves."); Akin v. Berryhill, 887 F.3d 314, 317-18 (7th Cir. 2018) ("We agree that the ALJ's evaluation of Akin's MRI results is flawed because the ALJ impermissibly 'played doctor.'"); Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir. 2018) ("An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.").

This does not mean the ALJ is required to obtain a new medical opinion any time a claimant continues to receive treatment leading up the hearing; under such a rule "a case might never end." Keys v. Berryhill, 679 Fed. Appx. 477, 481 (7th Cir. 2017); see also Olsen v. Colvin, 551 Fed. Appx. 868, 874 (7th Cir. 2014) ("The cases in which we have concluded that an ALJ 'played doctor' are ones in which the ALJ ignored relevant evidence and substituted her own judgment."). As the Seventh Circuit recently explained:

> [N]ot all new evidence will necessitate a remand. As the agency notes, in two unpublished cases, Keys v. Berryhill, 679 F. App'x 477 (7th Cir. 2017), and Olsen v. Colvin, 551 F. App'x 868 (7th Cir. 2014), this court upheld the denial of benefits when MRI evidence post-dating the state agency consultant's report showed only mild changes in the claimants' respective conditions. The issue, then, comes down to whether the new information "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of [the subsequent] report," Stage v. Colvin, 812 F.3d 1121, 1125 (7th Cir. 2016), or whether the updated information was minor enough that the ALJ did not need to seek a second opinion.

Kemplen v. Saul, No. 20-1651, 2021 U.S. App. LEXIS 2766, at *9 (7th Cir. Feb. 2, 2021).

The Commissioner argues that remand is not necessary here because the August 2016 cervical MRI provides little to no additional insight into plaintiff's impairments and their limiting effects. (Def.'s Br. at 8,11-12.) The Commissioner notes that this scan was "quite limited due to motion artifact, the patient's body habitus and extensive hardware" (Tr. at 638) and

12

contained findings similar to the October 2015 MRI (Def.'s Br. at 12). If anything, the Commissioner contends, the October 2015 scan, which the agency consultants did review, provided a more detailed analysis of plaintiff's impairments, without the limitations in clarity. (Def.'s Br. at 13.) The Commissioner further contends that, while plaintiff relies on the reference to myelomalacia in the August 2016 MRI, the record contains no actual diagnosis of that condition. Finally, even if the record does support such a diagnosis, plaintiff does not explain how possible myemalacia supports greater restrictions than those included in the RFC; although the agency consultants did not specifically consider myelomalacia, they did consider the related condition of myelopathy, and the ALJ considered all of plaintiff's symptoms, regardless of the cause. (Def.'s Br. at 13-14.)

I find that remand is required in this case based on the combination of the August 2016 MRI referencing myelomalacia and Dr. Jacoby's October 2016 explanation that this untreatable condition likely caused plaintiff's symptoms. Importantly, Dr. Jacoby's October 2016 statement undercuts the ALJ's findings that the surgeries were successful, that plaintiff required only conservative treatment going forward, and that the diagnostic evidence failed to support plaintiff's allegations of debilitating pain, as well as the ALJ's reliance on Dr. Jacoby's 2015 comment that he did not see "anything dangerous going on" in the previous scans.

While Dr. Jacoby used qualified language in October 2016 treatment note, the note does contain a diagnosis of myelomalacia. And while it may not have revealed an entirely new condition, the August 2016 MRI does contain new findings as compared to the 2015 cervical scan. And the ALJ's analysis of that scan, which the Commissioner concedes the agency consultants did not see, failed to include Dr. Jacoby's comments about myelomalacia and its effects. Perhaps myelomalacia causes the same symptoms as the conditions the ALJ did

13

consider, as the Commissioner suggests (Def.'s Br. at 14), but my review must be limited to the reasons the ALJ provided. See, e.g., Pierce v. Colvin, 739 F.3d 1046, 1050 (7th Cir. 2013) (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943)). The Commissioner also argues that whether the symptoms can be treated in the future is irrelevant to plaintiff's current capacity (Def.'s Br. at 14-15), but this misses the point. The doctor's statement acknowledging that this condition is un-treatable undermines the ALJ's characterization of plaintiff's treatment as conservative; a claimant cannot be faulted for failing to seek more aggressive treatment if none is available. See Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009); see also Lambert, 896 F.3d at 777-78 (reversing where the ALJ glossed over portions of treatment note upon which he relied). The matter must be remanded for reconsideration of the August 2016 cervical MRI and Dr. Jacoby's discussion of it.

### 2. Plaintiff's Statements

Plaintiff next argues that the ALJ erred in evaluating her statements regarding her symptoms and limitations. (Pl.'s Br. at 15.) As the ALJ acknowledged, symptom evaluation is a two step process. (Tr. at 25.) First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, once such an impairment has been shown, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment she has received for relief of the

14

pain or other symptoms. Id. at *18-19; 20 C.F.R. § 404.1529(c)(3). The ALJ must, after considering these factors, build a logical bridge between the evidence and his finding that the claimant's testimony was not credible, Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009), but on review, the court affords considerable deference to the ALJ's credibility conclusion, reversing only if it is "patently wrong." Ray v. Berryhill, 915 F.3d 486, 490 (7th Cir. 2019).

As indicated above, in the present case the ALJ found plaintiff's statements regarding her physical limitations inconsistent with her providers' findings on examination, her treatment history, and the diagnostic evidence. As plaintiff notes, much of the ALJ's analysis consists of a summary of the evidence, without an explanation as to how the evidence supported his finding. See John R. R. v. Comm'r of Soc. Sec., No. 2:18-CV-487-MGG, 2020 U.S. Dist. LEXIS 54800, at *24 (N.D. Ind. Mar. 30, 2020) ("A summary of evidence does not substitute for analysis of evidence."). When the ALJ did attempt to "connect the dots" his reasoning was flawed. (Pl.'s Br. at 16.) For instance, the ALJ discounted the April 2015 upper extremity EMG, which provided objective support for plaintiff's claim of pain radiating into the arm, instead relying on physical exam findings related to strength, reflexes and range of motion, which do not necessarily reveal pain as a symptom. See Ray v. Colvin, 219 F. Supp. 3d 825, 840 (N.D. Ill. 2016) ("The ALJ focuses on normal findings in reports of exams and does not explain why these outweigh the abnormal findings."). The ALJ also failed to appreciate that the August 2016 cervical MRI suggested an un-treatable condition that explained why plaintiff's symptoms persisted after the surgeries, undercutting the ALJ's findings that the diagnostic evidence failed to support plaintiff's claims and that the surgeries were successful. Finally, the ALJ emphasized plaintiff's later "conservative" treatment, diminishing the significance of her multiple surgeries and overlooking the fact that, after undergoing these procedures, the doctors had

15

little else to offer.[7]

The Commissioner responds that the ALJ is directed to consider the extent to which a claimant's alleged symptoms can be accepted as consistent with the objective medical evidence. (Def.'s Br. at 9.) Discrepancies between the objective evidence and self-reports may suggest symptom exaggeration, and the ALJ did point to some apparent inconsistencies between plaintiff's reports and her providers' observations on exam. (Def.'s Br. at 9-11.) While objective findings are important, they cannot be the only factor in a pain case. As the Seventh Circuit has noted, "pain can be real and intense yet its cause not be discernible by medical tests or examinations." Adaire v. Colvin, 778 F.3d 685, 687 (7th Cir. 2015).

The Commissioner briefly defends the ALJ's characterization of plaintiff's treatment as conservative (Def.'s Br. at 15), before noting that not "all of the ALJ's reasons must be valid as long as enough of them are." (Def.'s Br. at 16, quoting Halsell v. Astrue, 357 Fed. Appx. 717, 722 (7th Cir. 2009).) Since plaintiff underwent multiple surgeries, in addition to receiving injections, medication, and physical therapy, it is difficult to see what more could have been done. Moreover, as discussed above, the ALJ's analysis failed to include the required bridge from the evidence to the conclusion, and it contained errors of reasoning. The matter must be remanded for reconsideration of plaintiff's statements.

### 3. Dr. Jacoby's Opinion

Finally, plaintiff argues that the ALJ improperly rejected Dr. Jacoby's opinion. (Pl.'s Br.

---

[7]Plaintiff notes that, at the end of the RFC analysis, the ALJ referenced her daily activities, but he provided no explanation as to how those activities were inconsistent with her statements. (Pl.'s Br. at 20-21.) As plaintiff acknowledges, earlier in the decision the ALJ discussed daily activities in considering the mental impairments (Pl.'s Br. at 20); I do not read the concluding statement as suggesting plaintiff's activities undercut her claimed physical limitations.

16

at 21.) For claims like this one, filed before 2017, "the opinion of a treating physician is entitled to controlling weight if it is supported by sound medical evidence and is consistent with the record." Karr v. Saul, No. 20-1939, 2021 U.S. App. LEXIS 5228, at *5 (7th Cir. Feb. 23, 2021) (citing 20 C.F.R. § 404.1527(c)(2); Reinaas v. Saul, 953 F.3d 461, 465 (7th Cir. 2020)). "Once well-supported contrary evidence is introduced, however, a treating physician's opinion becomes just another piece of evidence for the ALJ to evaluate." Id. "ALJs must decide the weight of a treating physician's non-controlling opinion by considering, to the extent applicable, the treatment relationship's length, nature, and extent; the opinion's consistency with other evidence; the explanatory support for the opinion; and any specialty of the treating physician." Gerstner v. Berryhill, 879 F.3d 257, 263 (7th Cir. 2018). "An ALJ may assign limited weight to a treating physician's opinions if the ALJ articulates 'good reasons' for doing so." Gibbons v. Saul, 801 Fed. Appx. 411, 415 (7th Cir. 2020) (quoting 20 C.F.R. § 404.1527(c)(2); Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010)).

As indicated above, the ALJ discounted Dr. Jacoby's opinion based on generally normal exam findings, the normal lower extremity EMG study, the doctor's 2015 comment that he did not see "anything dangerous going on" in the imaging, and his return of plaintiff to full duty work in January 2015. As plaintiff notes, the ALJ mostly relied on cherry-picked evidence in reaching this conclusion. The ALJ cited various "normal" exam findings, while ignoring Dr. Jacoby's diagnosis of myelomalacia as an explanation for ongoing symptoms. He then cited the negative 2016 lower extremity EMG, while discounting the significance of the positive 2015 upper extremity EMG. He also relied on Dr. Jacoby's January 2015 return to work statement, made at a time when plaintiff was reporting some improvement after the August 2014 surgery, while ignoring plaintiff's recurrence of pain in April 2015, after which Dr. Jacoby referred her

17

for additional EMG testing. The ALJ's reliance on this provisional statement also overlooks Dr. Jacoby's performance of lumbar fusion surgery in August 2015, after which, he said, she would "hopefully return to full duty" (Tr. at 453); Dr. Jacoby initially returned plaintiff to work six hours per day but later reduced it to four hours per day and then 12 hours per week when that proved too much. (Tr. at 442, 446.)

The ALJ failed to explain why the absence of anything "dangerous" in the 2015 scans undermined Dr. Jacoby's assessment of plaintiff's functioning. Indeed, at the same time he made this observation Dr. Jacoby said that plaintiff "may be a candidate for disability." (Tr. at 447.) Moreover, Dr. Jacoby created the opinion at issue in 2017, after he had reviewed the results of the 2016 MRI revealing myelomalacia. Finally, while the ALJ recognized Dr. Jacoby as a treating provider, he did not acknowledge him as the surgeon who performed the 2014 and 2015 procedures. See 20 C.F.R. § 404.1527 ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

The Commissioner responds that the ALJ need not discuss each and every one of the regulatory factors but only minimally articulate his reasons for discounting a medical opinion. (Def.'s Br. at 20, citing Elder v. Astrue, 529 F.3d 408, 415-16 (7th Cir. 2008).) Here, the ALJ found Dr. Jacoby's opinion inconsistent with and not supported by the objective medical evidence. (Def.'s Br. at 21.) While plaintiff takes issue with the ALJ's reliance on certain pieces of evidence, the Commissioner contends that the ALJ's decision was reasonable in light of the whole medical record. (Def.'s Br. at 21-22.)

Where, as here, the specific reasons provided by the ALJ do not withstand scrutiny, the court cannot uphold the decision just because the record as a whole may support it. See

18

Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."). In reply, plaintiff contends that, contrary to the Commissioner's assertion, the ALJ must address each of the regulatory factors. (Pl.'s Rep. Br. at 8, citing Scrogham v. Colvin, 765 F.3d 685, 697 (7th Cir. 2014) (stating that "the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion").) Courts have generally declined to adopt a rigid rule requiring the ALJ to explicitly discuss each factor in § 404.1527 in every case. See Paul D. v. Saul, No. 19 C 4898, 2021 U.S. Dist. LEXIS 3809, at *8 (N.D. Ill. Jan. 8, 2021); Bruce P. v. Saul, No. 18 CV 7478, 2020 U.S. Dist. LEXIS 224504, at *9 (N.D. Ill. Dec. 1, 2020); Sauer v. Saul, No. 19-C-927, 2020 U.S. Dist. LEXIS 108750, at *47 (E.D. Wis. June 19, 2020). In the present case, it suffices to say that the ALJ failed to provide "good reasons" for his finding.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of March, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge